# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CHRISTOPHER MICHAEL TAYLOR,

        Defendant-Appellant.

UNPUBLISHED
June 29, 2017

No. 329358
Calhoun Circuit Court
LC No. 2014-003393-FC

Before: TALBOT, C.J., and BECKERING and M. J. KELLY, JJ.

PER CURIAM.

Following a trial, a jury convicted defendant, Christopher Michael Taylor, of one count of first-degree premeditated murder, MCL 750.316(1)(a), two counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, and one count of felon in possession of a firearm, MCL 750.224f. The trial court sentenced defendant as a fourth habitual offender, MCL 769.12, to two years' imprisonment for each felony-firearm conviction, to be served consecutively to concurrent prison terms of life without the possibility of parole for the first-degree murder conviction and 76 months to 300 months for the felon in possession of a firearm conviction. Defendant appeals his convictions by right. We affirm.

## I. PERTINENT FACTS

In the early morning hours of November 9, 2014, Xavier Embry was fatally shot as he sat in his car near 263 Parkway in Battle Creek. Two eyewitnesses testified at trial to what they saw. John Obyrne testified that his home was approximately 30 to 40 feet from where Embry was shot. He said that he woke up at approximately 3:20 a.m., and went to his enclosed front porch to smoke a cigarette. While on the porch smoking, he saw a man walk up to a parked white car, stand at an angle to the door, and reach an object that he held in his hand inside the vehicle. Obyrne then witnessed two "[t]wo loud pops and two flashes . . . inside the vehicle" that were consistent with gunshots. Afterward, he watched the man "walk[] back around the back side of the vehicle" and flee the scene through the yard of a nearby home. Obyrne said he was "positive" that the man was wearing "a sweat jacket-type of hoodie" that "had camo arms." Meosha Brown, who also witnessed the shooting as she sat in a nearby vehicle, provided testimony consistent with Obyrne's testimony. Although Brown could not tell the gender or race of the person who approached the white car prior to the sound of gunshots, she did see that the

-1-

person had on "some Army fatigues print." Obyrne telephoned the police. When they arrived, he told them where he had last seen the suspect.

Officer Kevin Farnham, a canine handler with the Battle Creek Police Department (BCPD), testified that, starting from where Obyrne told police he had last seen the suspect, he along with BCPD Officer Mikael Ziegler and Bruiser, Farnham's tracking-dog, tracked the suspect to a house on 213 Howland. There, they found defendant sitting alone on the porch, wearing a jacket with camouflage on the sleeves. Obyrne testified that approximately 10 minutes after the shooting, police took him to a house and showed him defendant, who was standing in the front yard of the house with officers behind and on either side of him, wearing the same clothing as the man he had seen approach Embry's car. He confirmed to the police that defendant was the man he had seen shoot into the white car. Obyrne also made an in-court identification of defendant as the shooter.

BCPD Officer Jordan Barrons was dispatched to 213 Howland to secure the scene and look for evidence. He testified that he found a nine-millimeter Taurus handgun in the backyard of the house. Detective Todd Rathjen, a BCPD lab specialist and latent fingerprint identification and comparison expert, testified that a fully identifiable latent fingerprint found on the gun's magazine matched that of defendant's left index finger. Firearms and tool marks expert Jeffrey Amley testified that the undamaged bullet removed from Embry's body and a spent shell casing recovered from Embry's car came from the gun recovered at 213 Howland. BCPD Detective Scott Eager, an expert in extracting information from mobile devices, testified that a photograph of a handgun found on defendant's cell phone was consistent with the gun found at 213 Howland.

## II. ANALYSIS

## A. EXCULPATORY EVIDENCE

Defendant first contends that his trial counsel rendered constitutionally ineffective assistance by failing to present exculpatory evidence that would have shown that he did not shoot Embry. BCPD Officer Ziegler testified that, before becoming unresponsive, Embry told him that "someone had come out of the woods and shot him," and that "he didn't know who it was." Defendant contends that his trial counsel was constitutionally ineffective for failing to present evidence that he and Embry had known each other for a long time and regularly socialized together. Defendant contends that such evidence would have been "powerful evidence of [defendant's] innocence" and that there is a reasonable probability that, had counsel presented said evidence, the outcome of the trial would have been different.

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). A trial court's findings of fact are reviewed for clear error, while questions of constitutional law are reviewed de novo. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). Given the absence of a *Ginther* hearing, our review is limited to errors apparent on the record. *People v*

*Horn*, 279 Mich App 31, 38; 755 NW2d 212 (2008). However, the trial court record has been expanded by the Court's admission pursuant to MCR 7.216(4)[1] of three affidavits that defendant submitted with a motion to this Court to remand the matter for a *Ginther* hearing. The affidavits are from Shawn Patterson, Marie Taylor, and Christina Taylor, respectively, defendant's cousin, sister, and mother. All three affiants averred that defendant and Embry had known each other for years, and stated, "[i]n late 2014, when Mr. Embry was killed, he and Mr. Taylor still had regular contact, and would socialize together at parties."

The right to counsel guaranteed by the United States and Michigan Constitutions, US Const, Am VI; Const 1963, art 1, § 20, entails the right to effective assistance of counsel. *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012). To establish ineffective assistance of counsel, a defendant must show that "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich at 51. Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. *Vaughn*, 491 Mich at 670.

Defendant's argument on appeal assumes that Embry saw the person who shot him, and that, having seen his face, concluded that he did not know his assailant. This assumption finds no support in the record. On the contrary, Obyrne testified that the shooter approached Embry's car from the rear, stood at an angle to the car, and reached the hand holding the gun into the car. Testimony from the medical examiner established that one of the fatal bullets entered Embry's body "a little bit posterior on the [left] shoulder" and "came forward through the lung," while the other bullet entered "right on the back of the shoulder." The testimony of Obyrne and the medical examiner support the notion that the gunman positioned himself slightly behind Embry, making it unlikely that Embry saw the gunman's face. Embry's own words confirm that he did not see the gunman. Embry said that "someone" came out of the woods and he did not know who "it" was. Embry statement indicates that he did not see the shooter well enough to detect whether the perpetrator was male or female. Further, there is no indication that defendant or any of the affiants informed defendant's trial counsel of defendant's acquaintance with Embry and that the affiants would have been willing to testify to it at trial to exonerate defendant. Certainly, trial counsel " 'has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " *People v Grant*, 470 Mich 477, 485; 684 NW2d 686 (2004), quoting *Strickland v Washington*, 466 US 668, 691; 104 S Ct 2052, 2066; 80 L Ed 674 (1984). However, as the phrase "*assistance* of counsel" suggests, one might reasonably expect defendant to have participated in his own defense and to have mentioned his long acquaintance with the man the prosecutor accused him of shooting. In light of these factors, we cannot conclude that trial counsel rendered constitutionally ineffective assistance by failing to call defendant's relatives to testify to his acquaintance with Embry.

---

[1] MCR 7.216(4) allows the Court "in its discretion, and on terms it deems just [to] permit amendments, corrections, or additions to the transcript or record." Here, the Court admitted the affidavits in lieu of granting defendant's motion for remand for a *Ginther* hearing.

Moreover, were we to assume that defense counsel's performance "fell below an objective standard of professional reasonableness," defendant cannot demonstrate that, but for counsel's alleged error, the outcome of the trial would have been different. The police had substantial evidence linking defendant to the crime, including: (1) Obyrne's eyewitness testimony; (2) testimony from two police officers that their canine track led from where the shooter was last seen to defendant's location; (3) testimony from these two officers that defendant was found wearing clothing similar to the clothing both Obyrne and Brown observed the shooter wearing; and (4) testimony from several police officers and experts linking the recovered gun to defendant and to the murder. Thus, even if defense counsel had called defendant's cousin, sister, and mother to testify to defendant's acquaintance with Embry, we cannot say that there is a reasonable probability that the outcome of the trial would have been different. *Trakhtenberg*, 493 Mich at 51. Consequently, he has not overcome his heavy burden of proving that defense counsel rendered constitutionally ineffective assistance. *Vaughn*, 491 Mich at 670.

## B. IDENTIFICATION

Defendant also contends that his due-process right was violated, and his trial counsel rendered constitutionally ineffective assistance by failing to object to, and move for suppression of, Obyrne's in-court identification of defendant as the gunman. Defendant asserts that Obyrne based his in-court identification on the unduly suggestive on-scene identification of defendant on the night of the shooting, and that Obyrne did not have an independent basis for identification. We disagree.

To challenge an identification on the basis of lack of due process, " 'a defendant must show that the pretrial identification procedure was so suggestive in light of the totality of the circumstances that it led to a substantial likelihood of misidentification.' " *People v Williams*, 244 Mich App 533, 542; 624 NW2d 575 (2001), quoting *People v Kurylczyk*, 443 Mich 289, 302; 505 NW2d 528 (1993) (opinion by GRIFFIN, J.). An on-scene identification that occurs shortly after a crime "to obtain reliability in the apprehension of suspects" is not necessarily improper. *People v Libbett*, 251 Mich App 353, 362; 650 NW2d 407 (2002). "Prompt, on-the-scene identifications are reasonable, 'indeed indispensable, police practices because they permit the police to immediately decide whether there is a reasonable likelihood that the suspect is connected with the crime and subject to arrest, or merely an unfortunate victim of circumstance.' " *Id.* at 359, quoting *People v Winters*, 225 Mich App 718, 728; 571 NW2d 764 (1997). "[O]ne of the main benefits of prompt on-the-scene identifications," the Court explained, "is to obtain reliability in the apprehension of suspects, which insures both that the police have the actual perpetrator and that any improvidently detained individual can be immediately released." *Libbett*, 251 Mich App at 362.[2]

---

[2] In the context of considering the constitutional right to counsel, *Winters* explained, "[t]he concerns associated with . . . a stationhouse lineup are simply absent where the police promptly apprehend a suspect and return him to the scene of the crime for identification by the victim." *Winters*, 225 Mich App at 725.

In this case, having Obyrne identify defendant at the scene was consistent with the police need "to obtain reliability in the apprehension of suspects." *Id*. Obyrne saw the gunman's face and noticed the distinctive clothing he was wearing. Additionally, he told police where he had last seen the gunman, which allowed police to track the gunman to a house, where they found defendant sitting on the house's porch. Because Obyrne had seen the perpetrator commit the crime just 10 minutes earlier, the perpetrator's appearance was still fresh in Obyrne's mind. Identification of defendant as the man he had seen shoot Embry confirmed the reliability of the results of the tracking procedure and, thus, the police's apprehension of defendant. It is true that police were standing around defendant; but this is not incongruous behavior, considering that they had just detained defendant, nor is there any indication that police were acting for reasons other than to determine whether defendant had committed the crime or was just an unfortunate victim of circumstance. See *id*. at 363. Furthermore, evidence linking the gun recovered from the backyard of the house where defendant was found to both defendant and Embry confirms the reliability of Obyrne's identification of defendant as the man he had seen shoot Embry. In light of the totality of the circumstances, we cannot say that the on-scene identification "led to a substantial likelihood of misidentification." *Williams*, 244 Mich App at 542. Therefore, we find no violation of defendant's right to due process.

Because we conclude that the on-the-scene identification was not improper, we also conclude that defense counsel did not render constitutionally ineffective assistance by failing to object to Obyrne's in-court identification of defendant on the basis that it had been tainted by the on-the-scene identification. Counsel is not ineffective for failing "to advocate a meritless position." *People v Mack*, 265 Mich App 122, 130; 695 NW2d 342 (2005) (quotation marks and citation omitted).

## III. CONCLUSION

We conclude that defendant has not met his heavy burden to prove that his trial counsel rendered constitutionally ineffective assistance. Defendant bases his contention that testimony from his relatives about his acquaintance with Embry would have exonerated him on an assumption not supported by the record. Further, even if his relatives had testified, substantial evidence linked him to the gun used to murder Embry; therefore, there is no reasonable likelihood that, but for counsel's alleged deficient performance, the outcome of the proceedings would have been different. Obyrne's on-the-scene identification of defendant as the shooter did not violate defendant's right to due process because it happened soon after the incident and for a proper purpose.

Affirmed.

/s/ Michael J. Talbot
/s/ Jane M. Beckering
/s/ Michael J. Kelly